***********
The Full Commission has reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments on appeal. The Full Commission AFFIRMS the decision of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The undersigned finds as facts and concludes as matters of law the following, which were entered into by the parties as an executed Pre-Trial Agreement, as
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. It is stipulated that all parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. Plaintiff was a patient at Dorothea Dix Hospital from January 26, 1996 through February 26, 1996, and again from June 26, 1996 through October 8, 1996.
4. Joshua Bullock was a patient at Dorothea Dix Hospital on Saturday, August 24, 1996.
5. On Saturday, August 24, 1996, some of the healthcare technicians on duty in the Cherry Building where Joshua Bullock was a resident were Larry Maynor, Jeff Mayberry, and Jonathon Crawley.
6. Joshua Bullock signed a Dorothea Dix Hospital police department "Crime Victim Decline to Prosecute" form, witnessed by Betty Clark Paesler on September 24, 1996.
7. The parties stipulated to the following exhibits at hearing:
a. Dorothea Dix Hospital records;
b. Holly Hill Charter Behavioral Health System records;
c. The Whitaker School records;
d. The Wright School records;
e. 1995-1996 school attendance records;
f. Plaintiff's Answers to Defendants' First Set of Interrogatories and Request for Production of Documents; and
g. Defendants' Answers to Plaintiff's First Set of Interrogatories and Request for Production of Documents.
FURTHERMORE, at the conclusion of the hearing, the parties stipulated that the deposition transcripts of Dr. James Mayo, Jr., Walter Stelle, PhD, Betty Clark Paesler, and Joshua Bullock would be accepted for the purposes of impeachment.
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. Plaintiff was born on October 23, 1982 and was 21 years old at the time of hearing.
2. When plaintiff was three months old his parents separated and custody was initially given to his father, Thomas Bullock. In 1985, when plaintiff was 2 years old, custody was given back to his mother, Diane Jones.
3. During the time that plaintiff resided with his mother, he often witnessed her being threatened and beaten by her boyfriends and/or husband. Plaintiff was also abused by his mother's husband.
4. While living with his mother, plaintiff was sexually abused by three different people, his maternal grandfather, his maternal uncle, and a woman friend of his mother.
5. Plaintiff witnessed his sister, April Bullock, being blown out of the back of a pickup truck when she was seven (7) years old, while his mother and her boyfriend were in the cab of the truck. Plaintiff thought his sister had died. After this incident, plaintiff's mother relinquished custody of April to Thomas and Marie Bullock. However, plaintiff continued to reside with his mother.
6. Plaintiff and his sister engaged in sexual intercourse with each other when they were thirteen (13) and fourteen (14) respectively.
7. Plaintiff was hospitalized at UNC Hospitals for hyperactivity from February 11, 1991 through March 29, 1991 where he was diagnosed with Attention Deficit Hyperactivity Disorder, severe adjustment disorder with mixed disturbance of emotions and conduct, and oppositional defiant disorder.
8. Plaintiff's father was able to regain custody of plaintiff on February 9, 1992, when Plaintiff was nine (9) years old.
9. Plaintiff was admitted to Holly Hill Hospital on September 12, 1995 after having a tantrum at school, where he threatened injury to himself and others. Plaintiff was discharged from Holly Hill on September 25, 1995 with a diagnosis of bipolar disorder, manic, severe, and rule out attention deficit hyperactivity disorder.
10. Plaintiff was again admitted to Holly Hill on October 4, 1995 after a suicidal gesture and threatening to kill his stepmother. Plaintiff was released from Holly Hill on October 12, 1995.
11. Plaintiff was admitted to Holly Hill for a third time on December 6, 1995 after a suicidal threat, property destruction, and an attack on his neighbor and stepmother. While at Holly Hill, plaintiff was nominated for "Willie M" classification. Plaintiff was released from Holly Hill on January 22, 1996.
12. After his release from Holly Hill, plaintiff attended Longview School for approximately four days before being suspended. On January 26, 1996, plaintiff was hospitalized at Dorothea Dix Hospital after destroying some property at his home with a machete and threatening to kill himself, his stepmother, and the police.
13. Plaintiff was discharged from Dorothea Dix on February 26, 1996 with a discharge diagnosis of attention deficit hyperactivity disorder, mild, predominantly impulsive type; depressive disorder, not otherwise specified; rule out post-traumatic stress disorder, chronic.
14. While at Dorothea Dix, plaintiff was certified as a member of the Willie M. class action.
15. After being discharged from Dorothea Dix, plaintiff returned to his father's home and attended Longview School. Plaintiff was suspended from Longview School on March 6, 1996.
16. Plaintiff was in a Juvenile Detention Center from April 27, 1996 through May 9, 1996 after stealing his father's car. He was adjudicated delinquent and put on probation.
17. Plaintiff was again admitted to Holly Hill Hospital on May 21, 1996 after exposing himself, driving while intoxicated, and having severe mood swings.
18. Plaintiff was released to a therapeutic foster home on June 3, 1996. While at the foster home, plaintiff left feces on various objects (plastic toothpaste containers, toothbrush, bubble bath bottles, bathroom walls and fixtures). It was thought that Plaintiff was sticking shampoo bottles and toothpaste tubes up his rectum.
19. Due to his behavior of spreading feces while at the foster home, plaintiff was admitted to Dorothea Dix on June 25, 1996.
20. After being admitted to Dorothea Dix, Plaintiff was noted on numerous occasions to have smeared feces in the boys bathroom (June 27 29, July 2, 24, 29, 30 31, and August 2, 1996).
21. On August 7, 1996, plaintiff acknowledged for the first time having smeared feces at the foster home in June 1996. However, at hearing, plaintiff did not remember past instances of smearing feces.
22. Dorothea Dix contacted Mr. Lawrence A. Ellsworth, CCSW, coordinator, Sexual Abuse Treatment Program of Wake County Mental Health, Developmental Disabilities and Substance Abuse Services, to evaluate Plaintiff for treatment of sexual abuse issues. Mr. Ellsworth evaluated plaintiff on July 12, 13, and 29, 1996. He issued his report, dated August 2, 1996, wherein he recommended that plaintiff's primary need was a stable, highly structured residential treatment program that could provide safety, security, predictability, and an opportunity for plaintiff to begin to work on the many issues troubling him.
23. On August 14, 1996, a patient at Dorothea Dix reported that plaintiff had asked to have sex with him, but this was not substantiated.
24. Plaintiff was moved from the Williams Building (intake) to the Cherry Building (chronic care) on August 19, 1996.
25. On August 22, 1996, plaintiff smeared feces in the towels in the hamper of the boys' bathroom.
26. On the evening of August 24, 1996, plaintiff and several other male patients were in the recreation room of the Cherry Building. There were no health care technicians in the recreation room with the patients. However, there were four healthcare technicians and one nurse on the hall and the door to the recreation room was open.
27. There is no national standard with regard to staffing at state psychiatric hospitals. Betty Paisler, RN, the Division Nurse Manager for the Child and Adolescent Unit at Dorothea Dix, testified that the staffing requirements for second shift were met.
28. At approximately 6:00 p.m. on August 24, 1996, Plaintiff and another patient, Brandon Steed, engaged in consensual sexual activity. The three other patients in the room observed this sexual activity between plaintiff and Brandon Steed and reported it later that night.
29. Immediately Dorothea Dix staff contacted the Dorothea Dix Hospital Police Department who conducted an investigation of this incident. Due to plaintiff's parents' lack of cooperation with the investigation and their failure to schedule an appointment for plaintiff to be interviewed, the police officers were never able to interview plaintiff. However, the officers were able to talk to the other witnesses and were able to determine that the incident was consensual. The police closed the file in October 1996 and noted that the case could be reopened at the request of either patient. Plaintiff never requested that the investigation be reopened.
30. When questioned at the time of the incident, Plaintiff denied any sexual activity had occurred between himself and Brandon Steed. Brandon Steed admitted to engaging in sexual activity with plaintiff.
31. Plaintiff filed this Tort Claim alleging that he was raped by Brandon Steed. The first time that Defendants were made aware of the alleged rape was at plaintiff's deposition on August 6, 2003, seven years after the incident.
32. In his deposition, plaintiff testified that on August 24, 1996 he was playing the piano in the recreation room when Travis Johnson, Marc Sams, and Brandon Steed approached him. He did not remember Ryan Cesar being there. He testified that the boys held a shirt over his face and that he hollered for help. Plaintiff testified that a tech came in and he immediately told the tech that he had been raped.
33. Plaintiff told a different story when he testified at the hearing on July 9, 2004. Plaintiff testified that he went into the rec room, watched TV, and began playing ping pong (not the piano). While he was playing, Travis Johnson, Ryan Cesar and Brandon Steed grabbed him and a sock (not a shirt) was placed around his mouth. He made no mention of Marc Sams. He was then taken to the piano behind the door and was raped by Travis Johnson while the other boys held him down. He did not testify that he yelled for help and instead stated that he did not tell anyone about the incident because he was scared.
34. At the hearing, plaintiff admitted that he was not truthful in his deposition.
35. After this incident, plaintiff admitted to his sex therapist, George Marks, and to Dr. Burlingame that this activity was consensual.
36. The medical records, police report and witness statements clearly indicate consensual sexual activity between plaintiff and Brandon Steed. Plaintiff was not raped.
37. Dr. Mayo testified that there was nothing in Plaintiff's prior medical records to indicate that Joshua would be a sexual offender. Plaintiff's prior activities were mainly aggression, anger, and primitive behavior such as exposing himself and spreading feces. Dr. Mayo's testimony was clear that this behavior was more indicative of someone who has been abused than of someone being a sexual predator or abuser themselves.
38. Dr. Mayo testified that plaintiff's behavior was really no different than the other boys on the ward, all of whom had problems. He further testified that Joshua was in the lower end of the aggression spectrum compared to the other patients.
39. At the time of this incident, there was no duty on the part of defendant to have one-on-one staffing or "eyes on" supervision with respect to plaintiff. Dr. Mayo testified that plaintiff's supervision was appropriate based on the information they had at that time.
40. The goal at Dorothea Dix is to get patients re-integrated back into the community. Under the law, they are required to house patients in the least restrictive environment possible.
41. Betty Clark Paesler testified that before patients can be released back into the community or into a step-down program, they have to demonstrate that the patient is capable of some autonomy and does not require constant supervision.
42. Plaintiff failed to show that he has been damaged in any way as a result of this incident. At the time of hearing, plaintiff had a job making $12.50 an hour. Plaintiff had not seen a psychiatrist, sought any treatment or been on any medication in the past eight years. Plaintiff testified that he has a healthy relationship with his wife and children.
43. Any problems that plaintiff now has are not the result of this incident at Dorothea Dix on August 24, 1996. Rather, they are the result of his longstanding abuse as a child and the environment in which he grew up. As a child, plaintiff was subject to physical and mental abuse and exposed to multiple other negative stimuli.
44. At the hearing, plaintiff called Dr. William Burlingame to testify as an expert witness as to the standard of care received by Plaintiff. The Commission allowed Dr. Burlingame to testify with regards to his treatment of plaintiff, but did not allow any testimony with regard to the standard of care given plaintiff while at Dorothea Dix Hospital.
45. Defendant served discovery requests on plaintiff in November 2001, which included requests for information regarding plaintiff's possible experts. Defendant received plaintiff's initial responses in May 2002. However, there was no mention of an expert witness at that time. Plaintiff did not designate Dr. Burlingame as his expert witness until May 28, 2004, less than ten days before trial. Plaintiff's designation of his expert was provided over two years after his initial discovery responses and was well beyond the end of the discovery period, which ended March 31, 2004.
46. Dr. Burlingame was attempting to testify to the standard of care provided by Dr. Mayo, a psychiatrist at Dorothea Dix. Dr. Burlingame is a psychologist, not a psychiatrist, and is therefore not qualified to testify as to the standard of care provided by a psychiatrist. See
N.C.R. Evid. 703 (1992)
47. Dr. Walter Stelle, the named alleged negligent employee in plaintiff's Affidavit, was the director of Dorothea Dix Hospital on August 24, 1996. Dr. Stelle has a PhD in psychology and his primary responsibilities at Dorothea Dix were administrative, involving the operation of the hospital. Dr. Stelle was not responsible for staffing the Cherry Building on August 24, 1996. It was not Dr. Stelle's responsibility to determine the supervision requirements for individual patients.
48. There was no testimony regarding what duty was owed to a patient at a state psychiatric hospital. Specifically, plaintiff provided no evidence with regard to what duty was owed to him by Dorothea Dix Hospital and that such duty was breached.
 ***********
The foregoing findings of fact engender the following:
 CONCLUSIONS OF LAW
1. Plaintiff was not raped on August 24, 1996 at Dorothea Dix Hospital as alleged in his Affidavit. He engaged in consensual sexual activity with another patient. However, the Commission grants the Plaintiff's Motion to allow the pleadings to conform to the evidence.
2. In order to sustain a compensable claim for damages under the Tort Claims Act, plaintiff must show that the injuries sustained were the proximate result of a negligent act of a named state employee. See N.C. Gen. Stat. § 143-291. In this case, plaintiff failed to show that he suffered any injury as a proximate result of the incident on August 24, 1996.
3. Plaintiff has failed to prove negligence on the part of any employee of Dorothea Dix Hospital on August 24, 1996.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission MODIFIES the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Pursuant to N.C. Gen. Stat. § 1A-1, Rule 41(b), Defendant's Motion to Dismiss Plaintiff's claim with prejudice is GRANTED.
2. Each side shall bear its own costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER